[No. 59714-6. En Banc. November 22, 1994.]

PROGRESSIVE ANIMAL WELFARE SOCIETY, *Respondent*, v. THE UNIVERSITY OF WASHINGTON, *Appellant*.

*Christine O. Gregoire, Attorney General*, and *Lisa A. Vincler, Assistant*, for appellant.

*John T. Costo*, for respondent.

*Sheldon E. Steinbach* on behalf of American Council on Education; *Joseph A. Keyes, Jr.*, on behalf of Association of

American Medical Colleges; *Martin Michaelson, Daniel B. Kohrman, David V. Snyder,* and *Alice D. Leiner* on behalf of American Council on Education and Association of American Medical Colleges, amici curiae for appellant.

*Clifford D. Stromberg, Barbara F. Mishkin, Jonathan S. Franklin,* and *David B. Robbins* on behalf of the American Psychological Association, amicus curiae for appellant.

*Kathleen N. McKereghan* on behalf of Washington State Biotechnology Association, amicus curiae for appellant.

*Patricia L. Friend, Alice D. Leiner,* and *J. Matthew Geyman* on behalf of The Johns Hopkins University and Washington Association for Biomedical Research, amici curiae for appellant.

*David F. Stobaugh* on behalf of the American Civil Liberties Union, amicus curiae for respondent.

DURHAM, J. — At issue is whether information in a university researcher's unfunded grant proposal involving use of animals in scientific research must be disclosed under the laws governing disclosure of public records. The trial court held that with excision of certain exempt information contained in the proposal, the proposal is subject to disclosure. We affirm in part and reverse in part. We affirm the trial court's decision that the proposal is not exempt from disclosure in its entirety and hold that the exempt material was properly excised. However, because a genuine issue of fact exists as to whether all relevant public records were properly divulged, we remand for further consideration.

In January 1991, Progressive Animal Welfare Society (PAWS) requested a copy of an unfunded grant proposal from the University of Washington (University) pursuant to the public records portion of the public disclosure act, RCW 42.17. The grant proposal, titled "Effects of Socialization on Forebrain Development", concerns research proposed by Dr. Gene Sackett in collaboration with Dr. Linda Cork from The Johns Hopkins University. The proposed project involves the study of brain development in asocially raised rhesus mon-

keys in an effort to understand and ultimately treat humans engaging in self-injurious behavior.

Pursuant to University procedure, the grant proposal was reviewed at several levels, including submission to the University's grant and contract services for approval. Because the project involves the use of vertebrate animals, it was also reviewed by the University's animal care committee to ensure compliance with federal requirements. As part of the latter review, a "project review form" was prepared identifying the project title, the number and type of animals to be used, whether alternatives to animal use are available, the relevance of the project to human or animal health or biology, the reasoning for using animals, the appropriateness of use of the species and number of animals used, and the care and treatment they will receive. As the University noted at oral argument, the animal care committee meets pursuant to the Open Public Meetings Act of 1971, RCW 42.30, and the project review forms are designed to be generally disclosable, ensuring a degree of public oversight of animal care and treatment. *Cf. Progressive Animal Welfare Soc'y v. UW*, 114 Wn.2d 677, 680, 684, 790 P.2d 604 (1990) (describing status of project review forms).

Once the grant proposal was approved at the various University levels, it was submitted to the National Institutes of Health (NIH) for funding. There, unfunded grant proposals go through a confidential peer review process. A group of scientists with expertise in the area of the proposed research reviews the grant proposal. The scientists' comments are incorporated into a formal written evaluation known as a "pink sheet". Clerk's Papers (CP), at 62. This pink sheet recommends approval or disapproval and contains a funding rank, which is important because only about 20 percent of approved proposals are actually funded. The pink sheet is given to the applicant. Projects which are not funded are often revised and resubmitted, sometimes to a different funding agency.

If funding is granted, the award is made to the University on behalf of the investigator. The University obtains con-

siderable external funding, consistently ranking as one of the leading universities in terms of dollars obtained.

Once a proposal is funded by the NIH, the grant application is made available to the public; thus, the project title, grantee institution, identity of principal investigator and amount of the award are disclosed. Also, a summary of the proposal and a budget breakdown is sent to the National Technical Information Service, United States Department of Commerce, and is available to the public. However, "[c]onfidential financial material and material that would affect patent or other valuable rights are deleted" from funded grant proposals which are requested under the Federal Freedom of Information Act. CP, at 213.

The NIH does not disclose any information about unfunded grant proposals and the "pink sheets". CP, at 203-05. The United States Department of Health and Human Services, Public Health Service grant application form instructions state that new grant applications for which awards have not been made are generally not available for release to the public, nor are the "pink sheets". CP, at 213. The peer review process is highly confidential, and breach of the standards applicable to that review and its participants may result in scientific misconduct charges being filed. CP, at 60. Moreover, the scientific community as a whole, and other universities, private and public, do not disclose information contained in unfunded grant proposals.[1]

---

[1]See CP, at 203-05 (Declaration of Joanne Belk, Acting Freedom of Information Officer of the National Institutes of Health, Department of Health and Human Services); CP, at 214-15 (Declaration of C. Frederick Bentley II, Director, Sponsored Projects Office, Stanford University); CP, at 216-18 (Declaration of David A. Blake, Senior Associate Dean, The Johns Hopkins University School of Medicine); CP, at 246-47 (Declaration of George H. Dummer, Director, Office of Sponsored Programs at the Massachusetts Institute of Technology); CP, at 267-68 (Declaration of Karl Hittelman, Associate Vice Chancellor, Academic Affairs, University of California at San Francisco); CP, at 269-70 (Declaration of Jack Lowe, Director, Grant and Contracts Office, Cornell University); CP, at 292-93 (Declaration of Henry Pfischner, Associate Director, Sponsored Programs and Contracts Office, Pennsylvania State University); CP, at 456-57 (Declaration of Richard P. Seligman, Associate Director, Office of Grant and Contract Administration, University of California, Los Angeles); CP, at 461-62 (Declaration of Alan Steiss, Director, Division of Research Development and Administration, University of Michigan).

The University public records officer denied PAWS' request for disclosure. PAWS appealed to University President Gerberding, who denied the appeal by letter dated March 7, 1991. On April 3, 1991, PAWS filed suit under the public records portion of the public disclosure act seeking access to the unfunded grant proposal. *See* RCW 42.17.340(1). The University moved for summary judgment, maintaining that as a matter of law the unfunded grant proposal was exempt from disclosure in its entirety.

PAWS conceded that it was not entitled to material which might reveal valuable formulae, designs, drawings and research data, trade secrets, or other confidential data. The trial court examined the unfunded grant proposal in camera, excised such material, and ruled the rest of the document was not protected from disclosure. The trial court granted summary judgment in favor of PAWS, requiring production of the unfunded grant proposal except for the excised material. Upon a motion for clarification by PAWS, the trial court explained it had excised material from the document which, in the court's view, an educated reader could use to reveal research hypotheses or data, valuable formulae and the like.

The trial court awarded attorney fees to PAWS as the prevailing party, but declined to award a penalty under RCW 42.17.340(3). The trial court also denied PAWS' request for production of certain internal University memoranda and correspondence on the ground that they were not relevant to the subject matter of the suit.

The University appealed to the Court of Appeals. PAWS cross-appealed to this court, and the University's appeal was transferred to this court.

## THE PUBLIC RECORDS ACT

The public records portion of the public disclosure act, RCW 42.17.250-.348 (hereafter, the Public Records Act or the Act), requires all state and local agencies to disclose any public record upon request, unless the record falls within certain very specific exemptions. The public disclosure act

was passed by popular initiative, Laws of 1973, ch. 1, p. 1 (Initiative 276, approved Nov. 7, 1972), and stands for the proposition that,

> *full access* to information concerning the conduct of government on every level must be assured as a fundamental and necessary precondition to the sound governance of a free society.

(Italics ours.) RCW 42.17.010(11).[2]

The stated purpose of the Public Records Act is nothing less than the preservation of the most central tenets of representative government, namely, the sovereignty of the people and the accountability to the people of public officials and institutions. RCW 42.17.251. Without tools such as the Public Records Act, government of the people, by the people, for the people, risks becoming government of the people, by the bureaucrats, for the special interests. In the famous words of James Madison, "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Letter to W.T. Barry, Aug. 4, 1822, 9 *The Writings of James Madison* 103 (Gaillard Hunt ed., 1910).

The Public Records Act "is a strongly worded mandate for broad disclosure of public records". *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978). The Act's disclosure provisions must be liberally construed, and its exemptions narrowly construed. RCW 42.17.010(11); RCW 42.17.251; RCW 42.17.920. Courts are to take into account the Act's policy "that free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials or others". RCW 42.17.340(3). The agency bears the burden of proving that refusing to disclose "is in accordance

---

[2]In order to implement its policy of full access to public records, the Public Records Act mandates that:

"*Each agency*, in accordance with published rules, *shall make available* for public inspection and copying *all public records*, unless the record falls within the specific exemptions of subsection (6) of this section, RCW 42.17.310, 42.17.315, or other statute which exempts or prohibits disclosure of specific information or records." (Italics ours.) RCW 42.17.260(1).

with a statute that exempts or prohibits disclosure in whole or in part of specific information or records". RCW 42.17.340(1). Agencies have a duty to provide "the fullest assistance to inquirers and the most timely possible action on requests for information". RCW 42.17.290. Finally, agencies "shall not distinguish among persons requesting records, and such persons shall not be required to provide information as to the purpose for the request" except under very limited circumstances. RCW 42.17.270; *see also* RCW 42.17.260(6).

The University relies upon several statutory exemptions, a constitutional argument concerning academic freedom, and a claim that certain federal statutes mandating nondisclosure preempt state statutes to the contrary. We begin by clarifying certain procedural matters.

PROCEDURAL MATTERS

Turning first to the nature of appellate review under the Public Records Act, the statute specifies that "[j]udicial review of all agency actions taken or challenged under RCW 42.17.250 through 42.17.320 shall be de novo." RCW 42.17.340(3). In *Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 35-36, 769 P.2d 283 (1989), we noted that the appellate court stands in the same position as the trial court where the record consists only of affidavits, memoranda of law, and other documentary evidence. This principle was drawn from the general rule that

> where the record both at trial and on appeal consists entirely of written and graphic material — documents, reports, maps, charts, official data and the like — and the trial court has not seen nor heard testimony requiring it to assess the credibility or competency of witnesses, and to weigh the evidence, nor reconcile conflicting evidence, then on appeal a court of review stands in the same position as the trial court in looking at the facts of the case and should review the record de novo.

*Smith v. Skagit Cy.*, 75 Wn.2d 715, 718, 453 P.2d 832 (1969), *cited in Spokane Police Guild*, at 36; *see also Brouillet v. Cowles Pub'g Co.*, 114 Wn.2d 788, 791 P.2d 526 (1990); *Dawson v. Daly*, 120 Wn.2d 782, 788, 845 P.2d 995 (1993);

RCW 42.17.340(3) ("The court may conduct a hearing based solely on affidavits."). Under such circumstances, the reviewing court is not bound by the trial court's findings on disputed factual issues. *Smith*, at 718-19.

■ Unlike *Spokane Police Guild, Brouillet*, and *Dawson*, however, this case was decided as a matter of summary judgment. The trial court ruled that there were no disputed issues of material fact and that, as a matter of law, PAWS was entitled to disclosure of material not covered by a specific exemption or other statute. While we affirm the trial court's excisions of the records before it, we find there is a genuine issue of fact whether the University has disclosed all pertinent material. Since resolution of this issue requires an evidentiary hearing, the appropriate course under summary judgment rules is to remand this case for resolution of that factual question.

■ PAWS contends that the University should be limited to arguing only those bases for nondisclosure cited by President Gerberding in his letter denying disclosure, since the letter constitutes final agency action under RCW 42.17.320. That section requires agencies to:

> establish mechanisms for the most prompt possible [internal] review of decisions denying inspection, and such review shall be deemed completed at the end of the second business day following the denial of inspection and shall constitute final agency action for the purposes of judicial review.

RCW 42.17.320. Section .320 encourages prompt internal agency review of actions taken by an agency's public records officer. It also provides that, regardless of internal review, initial decisions become final for purposes of judicial review after 2 business days. The section does not, however, alter the fact that courts are to review agency actions de novo. Moreover, if agencies were forced to argue exhaustively all possible bases under pain of waiving the argument on review, the goal of prompt agency response might well be subverted. We therefore decline to consider only those bases cited by the University in its letter denying disclosure.

SPECIFIC EXEMPTIONS

We now examine the exemptions claimed by the University under the Public Records Act. The University first argues that unfunded grant proposals are protected from disclosure pursuant to RCW 42.17.310(1)(b), since compelled disclosure would be highly offensive to a reasonable person and lacks legitimate public concern. However, this exemption states only that: "Personal information in files maintained for employees . . . of any public agency to the extent that disclosure would violate their right to privacy" shall be exempt from public inspection and copying. RCW 42.17.310(1)(b). The right to privacy is, in turn, violated "only if disclosure of information about the person: (1) Would be highly offensive to a reasonable person, and (2) is not of legitimate concern to the public". RCW 42.17.255. Unfortunately, the University does not specify the "personal information" it believes to be exempt. It is true that the disclosure of a public employee's Social Security number would be highly offensive to a reasonable person and not of legitimate concern to the public. Also, residential addresses and telephone numbers of employees of public agencies are independently exempt from disclosure under RCW 42.17.310(1)(u). Finally, under certain conditions the names of animal researchers may be withheld. *See* RCW 4.24.580.[3] Apart from these items of information, two of which do not come under RCW 42.17.310(1)(b) in any event, nothing resembling protected "personal information" appears in the unfunded grant proposal.

The University next contends that much of the unfunded grant proposal is covered by the "valuable formulae" or "research data" exemption to the Public Records Act. That exemption excludes from public inspection and copying:

> Valuable formulae, designs, drawings, and research data obtained by any agency within five years of the request for disclosure when disclosure would produce private gain and public loss.

---

[3]The protections afforded researchers under RCW 4.24.580 are discussed in detail, *infra* at 263.

RCW 42.17.310(1)(h). The clear purpose of the exemption is to prevent private persons from using the Act to appropriate potentially valuable intellectual property for private gain. It limits this exemption to information that has been obtained by an agency within 5 years of the request for disclosure. In effect, the Public Records Act protects recently acquired intellectual property from being converted to private gain.

We agree that much of the material at issue is covered by this exemption. However, the University's argument is vitiated by the fact that PAWS has waived any claim to material which comes under this exemption. While such material may be properly excised by the University, those portions which do not come within the exemption and which are not covered by any other exemption or other statute must be disclosed. *See* RCW 42.17.310(2); RCW 42.17.260(1).

██ PAWS disputes the precise scope of this exemption, and argues that the trial court excised too much material under it. However, in science, data and hypotheses are inextricably intertwined. Valuable "research data" include not only raw data but also the guiding hypotheses that structure the data. Accordingly, the trial court properly excised hypotheses and other information from which an informed reader might deduce relevant data or hypotheses.[4] Moreover, the valuable research data implicit in unfunded grant proposals is precisely the kind of information or record envisaged by this exemption. If the data or hypotheses contained in the unfunded grant proposal were prematurely released, the disclosure would produce both the private gain constituted by potential intellectual property piracy and the public loss of patent or other rights. See CP, at 204-05. We conclude the trial court properly interpreted the scope of this exemption.

---

[4]The exemption creates a 5-year window in which valuable research data may be used exclusively by the agency, without the threat of forced disclosure under the Act. Because the value of biomedical research data inheres in the hypotheses that ultimately generate the research data, it makes little sense to say that the data may be withheld but the hypotheses must be disclosed. Moreover, in the intensely competitive atmosphere of modern biomedical research, budget breakdowns, in combination with information disclosed in the project review forms, might be used to glean valuable information about the proposed research.

■ ■ The University next suggests that the grant proposal is exempt under the "deliberative process" exemption, which precludes disclosure of:

> Preliminary drafts, notes, recommendations, and intra-agency memorandums in which opinions are expressed or policies formulated or recommended except that a specific record shall not be exempt when publicly cited by an agency in connection with any agency action.

RCW 42.17.310(1)(i). The purpose of this exemption "severely limits its scope". *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 133, 580 P.2d 246 (1978). Its purpose is to "protect the give and take of deliberations necessary to formulation of agency policy". (Citation omitted.) *Hoppe*, at 133. For that reason, the exemption "only protects documents which are part of 'a *deliberative or policy-making* process' ". *Brouillet v. Cowles Pub'g Co.*, 114 Wn.2d 788, 799, 791 P.2d 526 (1990) (quoting *Hoppe*, at 133). We have specifically rejected the contention that this exemption applies to all documents in which opinions are expressed regardless of whether the opinions pertain to the formulation of policy. *Hoppe*, at 132-33. *See also Brouillet*, at 799-800 (overruling *Hafermehl v. UW*, 29 Wn. App. 366, 628 P.2d 846 (1981)). Moreover, unless disclosure would reveal and expose the deliberative process, as distinct from the facts upon which a decision is based, the exemption does not apply. *Hoppe*, at 133.

In order to rely on this exemption, an agency must show that the records contain predecisional opinions or recommendations of subordinates expressed as part of a deliberative process; that disclosure would be injurious to the deliberative or consultative function of the process; that disclosure would inhibit the flow of recommendations, observations, and opinions; and finally, that the materials covered by the exemption reflect policy recommendations and opinions and not the raw factual data on which a decision is based. *Columbia Pub'g Co. v. Vancouver*, 36 Wn. App. 25, 31-32, 671 P.2d 280 (1983) (citing *Hoppe*, at 132-33). Subjective evaluations are not exempt under this provision if they are treated as raw factual data and are not subject to further

deliberation and consideration. *Hoppe*, 90 Wn.2d at 134. Once the policies or recommendations are implemented, the records cease to be protected under this exemption. *Brouillet*, 114 Wn.2d at 799-800.

While the unfunded grant proposal itself does not reveal or expose the kind of deliberative or policy-making process contemplated by the exemption, the so-called "pink sheets" do. Because the pink sheets foster a quintessentially deliberative process, we hold they are exempt from disclosure under this provision, but only while they pertain to an unfunded grant proposal.[5] Once the proposal becomes funded, it clearly becomes "implemented" for purposes of this exemption, and the pink sheets thereby become disclosable.

 The University next contends that unfunded grant proposals are exempt in their entirety under RCW 42.17.330, which provides in relevant part:

> The examination of any specific public record may be enjoined if, upon motion and affidavit by an agency or its representative or a person who is named in the record or to whom the record specifically pertains, the superior court . . . finds that such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions.

The University argues that research is a vital governmental function which would be substantially and irreparably damaged by even partial disclosure of unfunded grant proposals. The University's argument misconstrues the nature of RCW 42.17.330. As its language reveals, that section merely creates an injunctive remedy, and is not a separate substantive exemption.

RCW 42.17.330 is simply an injunction statute. It is a *procedural* provision which allows a superior court to enjoin the release of *specific* public records if they fall within *specific* exemptions found elsewhere in the Act. *Spokane*

---

[5] Of course, merely raw factual data contained in the pink sheets and not covered by any other exemption (such as the valuable research data exemption) is disclosable even where the grant proposal remains unfunded. *See Brouillet*, at 800.

*Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 35-37, 769 P.2d 283 (1989). Stated another way, section .330 governs access to a remedy, not the substantive basis for that remedy.

In fact, the Public Records Act contains no general exemptions. It provides only:

> specific *statutory exemptions* from disclosure for those particular categories of public records most capable of causing substantial damage to the privacy rights of citizens or damage to vital functions of government if they are disclosed. These statutory exemptions were carefully drawn and have subsequently been changed and added to by the Legislature as it deemed necessary.

*In re Rosier*, 105 Wn.2d 606, 621, 717 P.2d 1353 (1986) (Andersen, J., dissenting in part, concurring in part).

The Public Records Act begins with a mandate of full disclosure of public records; that mandate is then limited only by the precise, specific, and limited exemptions which the Act provides.[6] As we noted in *Spokane Police Guild*:

> [W]e start with the proposition that the act establishes an affirmative duty to disclose public records unless the records fall within *specific statutory exemptions or prohibitions*. It follows that in an action brought pursuant to the injunction statute (RCW 42.17.330), the initial determination will ordinarily be whether the information involved is in fact within one of the act's exemptions or within some other statute which exempts or prohibits disclosure of specific information or records.

(Footnote omitted. Italics ours.) 112 Wn.2d at 36.

Indeed, the Legislature's response to our decision in *In re Rosier, supra*, establishes that the Public Records Act contains no general "vital governmental functions" exemption. In *Rosier*, this court interpreted general language in a procedural section of the Act concerning personal privacy to create a general personal privacy exemption. 105 Wn.2d at

---

[6]While generally mandating full disclosure, the Act is not without exemptions from disclosure. Since its adoption, the number of exemptions has increased from 10 in the original initiative to 40-odd exemptions today. *Compare* Laws of 1973, ch. 1 *with* RCW 42.17.310-.31902. Notwithstanding the increasing number of specific exemptions, the Legislature has never adopted an all-purpose or open-ended exemption. To the contrary, the Act's exemptions are highly specific, limited and carefully crafted. *See* RCW 42.17.310(1)(a)-(ee); RCW 42.17.312-.31902.

611-14. The Legislature specifically overturned that holding. Laws of 1987, ch. 403, § 1, p. 1546. By doing so, the Legislature explicitly restored:

> the law relating to the release of public records largely *to that which existed prior to the Washington Supreme Court decision in "In re Rosier,"* . . . The intent of this legislation is to make clear that . . . agencies having public records should rely *only upon statutory exemptions or prohibitions* for refusal to provide public records.

(Italics ours.) Laws of 1987, ch. 403, § 1, p. 1546. Moreover, the actual changes the Legislature made reveal that section .330 is not one of the permissible statutory exemptions or prohibitions. In rejecting our holding in *Rosier*, the Legislature added the following underlined language to the Public Records Act.

> (1) Each agency, in accordance with published rules, shall make available for public inspection and copying all public records, unless the record falls within the specific exemptions of subsection (5) of this section, RCW 42.17.310, 42.17.315, or other statute which exempts or prohibits disclosure of specific information or records. To the extent required to prevent an unreasonable invasion of personal privacy interests protected by RCW 42.17.310 and 42.17.315, an agency shall delete identifying details in a manner consistent with RCW 42.17.310 and 42.17.315 when it makes available or publishes any public record . . . .

Laws of 1987, ch. 403, § 3, p. 1547 (amending RCW 42.17.260). Three times the changes mention the sources of specific exemptions or prohibitions on which alone nondisclosure may be predicated. Each time the changes fail to mention RCW 42.17.330 as a source of such exemptions or prohibitions. We do not believe that the Legislature meant to include section .330 as an independent statutory source of exemptions, yet somehow neglected to specifically mention it along with sections .310 and .315 — its nearest statutory neighbors at the time.

Nor does it make sense to imagine the Legislature believed judges would be better custodians of open-ended exemptions because they lack the self-interest of agencies. The Legislature's response to our opinion in *Rosier* makes

clear that it does not want judges any more than agencies to be wielding broad and maleable exemptions. The Legislature did not intend to entrust to either agencies or judges the extremely broad and protean exemptions that would be created by treating section .330 as a source of substantive exemptions.

The University's interpretation of section .330 is mistaken for another reason. If section .330 were a source of broad exemptions for personal privacy and vital governmental interests, it would render the carefully crafted exemptions of RCW 42.17.310 superfluous. A trial court or appellate court reviewing de novo could simply declare records covered by personal privacy or vital governmental interests without ever having to invoke or construe the exemptions of RCW 42.17.310. We will not interpret statutes in a manner that renders portions of the statute superfluous. *Lutheran Day Care v. Snohomish Cy.*, 119 Wn.2d 91, 829 P.2d 746 (1992) (statutes should not be interpreted in such a way as to render any portion meaningless, superfluous, or questionable), *cert. denied*, 113 S. Ct. 1044 (1993). The University's interpretation of section .330 relegates the specific exemptions in RCW 42.17.310 to the status of optional guidelines.

Finally, the Legislature takes the trouble to repeat three times that exemptions under the Public Records Act should be construed narrowly. RCW 42.17.010(11); RCW 41.17.251; RCW 42.17.920. The Legislature leaves no room for doubt about its intent:

> The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created. The public records subdivision of this chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy.

RCW 42.17.251.

In sum, the Public Records Act contains only limited and specific exemptions. Treating section .330 as an exemption,

that is, as a method of withholding otherwise disclosable public records, is the exact functional equivalent of the error underlying *Rosier*. It also contradicts the Legislature's command to construe the exemptions narrowly and would render portions of the Act superfluous. We conclude that RCW 42.17.330 does not require withholding the unfunded grant proposals in their entirety.[7]

## "OTHER STATUTES EXCEPTION"

In general, the Public Records Act does not allow withholding of records in their entirety. Instead, agencies must parse individual records and must withhold only those portions which come under a specific exemption. Portions of records which do not come under a specific exemption must be disclosed. RCW 42.17.310(2).[8]

 There is an exception to this redaction requirement. The "other statutes" exemption incorporates into the Act other statutes which exempt or prohibit disclosure of specific information or records. RCW 42.17.260(1).[9] In other words, if such other statutes mesh with the Act, they oper-

---

[7]We decline to endorse our dicta in *Dawson v. Daly*, 120 Wn.2d 782, 845 P.2d 995 (1993) that section .330 creates an independent source of exemptions. *Dawson*, at 793-94. *Dawson* involved a number of different kinds of records and a number of specific exemptions. We held that the majority of requested documents were covered by the work product exemption or the employee privacy exemption. *Dawson*, at 792, 794-99; RCW 42.17.310(1)(j), (1)(b). Our brief and peripheral discussion of section .330 was contingent on the trial court finding on remand that some of the documents did not fall within the scope of the work product exemption. In any event, any implication that section .330 creates an independent exemption for vital governmental interests is directly at odds with the Legislature's thrice-repeated demand that exemptions be narrowly construed. RCW 42.17.010(11); RCW 42.17.251; RCW 42.17.920. Further, such an interpretation, whether in dicta or not, replicates precisely the error of *Rosier* and ignores the legislative response to *Rosier*.

[8]This requirement applies by its terms only to those exemptions at RCW 42.17.310. The 10 exemptions listed in RCW 42.17.312-.31902 are therefore not subject to the redaction requirement of RCW 42.17.310(2).

[9]RCW 42.17.260(1) provides, in relevant part:

"Each agency, in accordance with published rules, shall make available for public inspection and copying all public records, unless the record falls within the specific exemptions of subsection (6) of this section, RCW 42.17.310, 42.17.315, *or other statute* which exempts or prohibits disclosure of specific information or records." (Italics ours.)

ate to supplement it. However, in the event of a conflict between the Act and other statutes, the provisions of the Act govern. RCW 42.17.920. Thus, if another statute (1) does not conflict with the Act, and (2) either exempts or prohibits disclosure of specific public records in their entirety, then (3) the information may be withheld in its entirety notwithstanding the redaction requirement.[10] The rule applies only to those exemptions explicitly identified in other statutes; its language does not allow a court "to imply exemptions but only allows specific exemptions to stand". *Brouillet v. Cowles Pub'g Co.*, 114 Wn.2d 788, 800, 791 P.2d 526 (1990).

 Two state statutes qualify as "other statutes" in the present context, although neither justifies withholding the grant proposal in its entirety. First, the State Uniform Trade Secrets Act (UTSA) defines a trade secret expansively as,

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, *actual or potential*, from not being generally known . . . and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(Italics ours.) RCW 19.108.010(4). The UTSA also provides that "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order", RCW 19.108.020(3), and provides broad means for courts to preserve the secrecy of trade secrets. RCW 19.108.050. Actual or even threatened misappropriation may be enjoined. RCW 19.108.020(1). Given the *potential* for unfunded biomedical grant proposals to eventuate in trade secrets as broadly defined by the statute, this "other statute" operates as an independent limit on disclosure of portions of the records at issue here that have even potential economic value. The Public Records Act is simply an improper means to acquire knowledge of a trade secret. The Legislature recently emphasized this in a slightly different context:

---

[10] We do not now decide whether a statute outside of RCW 42.17 "conflicts" with the Public Records Act if the other statute merely overlaps with or encompasses an exemption within the Act.

The legislature . . . recognizes that protection of trade secrets, other confidential research, development, or commercial information concerning products or business methods promotes business activity and prevents unfair competition. Therefore, the legislature declares it *a matter of public policy that the confidentiality of such information be protected and its unnecessary disclosure be prevented.*

(Italics ours.) Laws of 1994, ch. 42, § 1, p. 130.

 Second, the Legislature has passed an anti-harassment statute specifically geared to animal researchers. RCW 4.24.580. That section provides that:

Any individual having reason to believe that he or she may be injured by the commission of an intentional tort under RCW 4.24.570 or 4.24.575 may apply for injunctive relief to prevent the occurrence of the tort. Any individual who owns or is employed at a research or educational facility or an agricultural production facility where animals are used for research, educational, or agricultural purposes who is harassed, or believes he or she is about to be harassed, by an organization, person, or persons whose intent is to stop or modify the facility's use or uses of an animal or animals, may apply for injunctive relief to prevent the harassment.

"Harassment" is, in turn, defined as:

any threat, without lawful authority, that the recipient has good reason to fear will be carried out, that is knowingly made for the purpose of stopping or modifying the use of animals, and that either (a) would cause injury to the person or property of the recipient, or result in the recipient's physical confinement or restraint, or (b) is a malicious threat to do any other act intended to substantially cause harm to the recipient's mental health or safety.

RCW 4.24.580(2). Quite clearly, the Legislature intended to forestall the kinds of threats, harassment, and intimidation that have become all too familiar to those attempting to carry out legitimate biomedical research. We hold that researchers may seek to enjoin the release of certain portions of public records if the nondisclosure of those portions is necessary to prevent harassment as defined under the anti-harassment statute. Though the names of the researchers in the present case have already been divulged, the names of researchers or certain other information in future grant proposals need not be divulged under the Public

Records Act, provided the anti-harassment statute is properly invoked and its criteria met.

### ACADEMIC FREEDOM

██ The University argues that the grant proposal should be exempt in its entirety because disclosure of a researcher's preliminary ideas violates a putative constitutional privilege of academic freedom. First, to the extent the preliminary ideas are covered by the valuable research data, trade secrets, or deliberative process exemptions, this argument does not apply. Second, even if it did apply, we are not convinced the extension of freedom of speech doctrine advocated by the University is either required or advisable. As the United States Supreme Court remarked in its only case on point:

> In our view, petitioner's reliance on the so-called academic-freedom cases is somewhat misplaced. In those cases government was attempting to control or direct the *content* of the speech engaged in by the university or those affiliated with it.

*University of Pa. v. EEOC*, 493 U.S. 182, 197, 107 L. Ed. 2d 571, 110 S. Ct. 577 (1990). The Public Records Act does not impose any content-based restrictions on speech. We cannot but agree with the Supreme Court when it stated:

> In essence, petitioner asks us to recognize an *expanded* right of academic freedom to protect confidential peer review materials from disclosure. Although we are sensitive to the effects that content-neutral government action may have on speech, and believe that burdens that are less than direct may sometimes pose First Amendment concerns, we think the First Amendment cannot be extended to embrace petitioner's claim.

(Citations omitted.) 493 U.S. at 199.

Moreover, from the point of view of the First Amendment, the speech of employees of the University is not somehow superior to the speech of other agency employees. Even assuming there were plausible grounds for doing so, it would be difficult to grant special First Amendment protection to public university employees while denying it to other state employees. It is true that courts traditionally have been reluctant to interfere unnecessarily in the internal function-

ing of universities. *University of Pa.*, at 199. However, the present situation is different. The Public Records Act was enacted by popular initiative and has been amended numerous times by the Legislature. Neither the people nor the Legislature created a general exemption from the Act for public universities or for academics. We see no constitutionally compelling reason to do so.

### FEDERAL PREEMPTION

The University argues that various federal laws preempt the Public Records Act. Congress may preempt state law in three basic manners: express preemption, field preemption, and conflict preemption. *See Department of Ecology v. PUD 1*, 121 Wn.2d 179, 192-99, 849 P.2d 646 (1993), *aff'd*, 114 S. Ct. 1900 (1994). We have recently summarized preemption principles:

> Federal preemption of state law may occur if Congress passes a statute that expressly preempts state law, if Congress preempts state law by occupation of the entire field of regulation or if the state law conflicts with federal law due to impossibility of compliance with state and federal law or when state law acts as an obstacle to the accomplishment of the federal purpose.

*Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 326, 858 P.2d 1054 (1993) (citing *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604-05, 115 L. Ed. 2d 532, 111 S. Ct. 2476, 2481-82 (1991)). We have also repeatedly emphasized that

> [T]here is a strong presumption against finding preemption in an ambiguous case and the burden of proof is on the party claiming preemption. . . . State laws are not superseded by federal law unless that is the clear and manifest purpose of Congress.

(Footnotes omitted.) *Fisons*, at 327.

The University first claims that the Federal Freedom of Information Act (FOIA) preempts state law to the contrary, and mandates nondisclosure of the grant proposals in their entirety. FOIA does not contain an express preemption provision. To the contrary, FOIA applies by its terms only to federal agencies. *See* 5 U.S.C. §§ 552(e), 551(1) (defining

agency). Indeed, given its explicit definition of "agency", FOIA may be said to expressly decline preemptive effect. In any event, the University fails to explain why FOIA's provisions, applicable on their face only to federal agencies, should apply to a state university.

Nor does FOIA so comprehensively or pervasively occupy the field of public disclosure as to raise a colorable claim of field preemption or conflict preemption.

> A university which receives federal grants is not federal and is not covered [by FOIA]. . . .
>
> The FOIA is a *federal* statutory enactment imposing federal burdens on federal agencies. State and local governmental bodies are not covered, as they are not federal agencies.

(Footnotes omitted.) James T. O'Reilly, *Federal Information Disclosure* § 4.02, at 4-7 (2d ed. 1994); *see also* § 4.02, at 4-4 through 4-5 (listing state agencies in list of "typical exclusions" of entities from FOIA jurisdiction). As we have previously noted, while the Public Records Act closely parallels the Federal Freedom of Information Act, nevertheless the "state act is more severe than the federal act in many areas". *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 129, 580 P.2d 246 (1978). Moreover, because FOIA simply does not apply to state agencies, there can be no federal-state conflict of the kind that gives rise to conflict preemption.[11]

The University next relies on the Bayh-Dole Act. The Bayh-Dole Act addresses ownership of federally funded inventions, and authorizes federal agencies to withhold from disclosure any information disclosing any invention in which the federal government owns or may own right, title, or

---

[11]The University argues that federal "policy" exempts unfunded grant proposals in their entirety, and that this policy somehow has preemptive effect. The University's support for this assertion is testimony from the acting FOIA officer at the National Institutes of Health. CP, at 203-13. The FOIA officer in turn relies on 45 C.F.R. §§ 5.65 and 5.67, which regard FOIA's commercial and personal privacy information exemptions. While we have recognized some cases where federal regulations preempt state statutes, those cases involve express preemption. *See Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 327 n.41, 858 P.2d 1054 (1993). The regulations cited by the FOIA officer contain no express preemption provisions. Moreover, given FOIA's definition of "agency", any federal agency which promulgated regulations purporting to bind state agencies would be acting ultra vires.

interest for a reasonable time for a patent application to be filed. 35 U.S.C. §§ 200, 205. For three reasons this does not apply. First, no information described in the Bayh-Dole Act is subject to disclosure under the trial court's order. Second, the type of information which may be withheld under that act falls within the state valuable formulae or research data exemption, so there is no conflict between the federal and state acts. Both scrupulously protect information pertaining to valuable intellectual property, and, without a direct clash between federal and state law, the preemption doctrine is not relevant. Third, the confidentiality provisions of the Bayh-Dole Act apply only to federal agencies, and they merely authorize rather than mandate nondisclosure of information which would reveal any invention in which the federal government has a right, title, or interest. 35 U.S.C. § 205.

The University also appeals to federal patent law. As we indicated above, trade secrets and valuable formulae or research data are protected from disclosure under the State Public Records Act. Moreover, PAWS has waived any access to proprietary or patent-related information. Because the trial court excised anything resembling patentable information or ideas, and because PAWS waived access to the applicability of patent law to the Public Records Act, the issue is not properly before us.

 Finally, the University argues that federal copyright law forbids even partial disclosure. Unfortunately, the University fails to explain if the material remaining after the trial court's redaction may be copyrighted at all. Moreover, copyright protection does not ensure confidentiality. Instead, it only protects against unauthorized copying, performance, or creation of derivative works. 17 U.S.C. § 106. To put the matter concisely, copyright protection does not preclude inspection of copyrighted material.

### REQUESTS FOR PRODUCTION

PAWS appeals the trial court's ruling regarding three documents in addition to the unfunded grant proposal.[12]

---

[12]PAWS made its public records request on January 9, 1991. The three documents were created in June 1991. The request asked for "any and all documents

These documents, together with the proposal, were sealed by the trial court under a protective order.

During pretrial discovery, PAWS sought to obtain any documents exchanged between Dr. Sackett, who is the coauthor of the grant proposal, and various other university employees concerning the release to PAWS of the grant proposal at issue. The University eventually produced three documents it considered responsive to PAWS' requests for production, and the trial court reviewed these documents in camera. The University contended, and the trial court agreed, that the documents were not relevant to PAWS' public records request because the three documents were created several months after the initial request.

To the contrary, the documents cast a backward light on the University's response to the January 9, 1991, request. The documents include a letter from Dr. Sackett in which he clearly states that he will not respond to requests for information pursuant to the Public Records Act.[13] Refusal to comply with the Public Records Act, however well intended, is not an appropriate response to legislative mandate.

We acknowledge that some "animal rights" activists have acted improperly and, on occasion, illegally. However, the protective measures of the anti-harassment statute provide a powerful shield against harassment as well as a sword against harassers. RCW 4.24.580 (providing for injunctive relief from harassment); RCW 4.24.570 (providing for joint and several liability on the part of persons or organizations planning or assisting in acts against animals in research or educational facilities). The anti-harassment statute sends a

---

constituting, associated with, and related to" the unfunded grant proposal. CP, at 8.

[13]The letter from Dr. Sackett describes the continuing harassment to which he has been subjected as an animal researcher. It goes on to describe the fear engendered in researchers by attacks on research facilities and personal attacks. However, the letter also states in part, "I will not reply to requests such as this regardless of any court decisions, fines, or possibilities of imprisonment for not complying with our state's public disclosure laws."

clear message that threats, harassment and intimidation will not be tolerated.[14]

An agency's compliance with the Public Records Act is only as reliable as the weakest link in the chain. If any agency employee along the line fails to comply, the agency's response will be incomplete, if not illegal.[15] There is, then, at least a question of fact whether Dr. Sackett silently withheld documents that should have been disclosed pursuant to PAWS' January 9, 1991, records request.

There appears to be an additional question of fact. For reasons that are not apparent from the record, portions of the grant proposal were not submitted to the trial court. An affidavit in the record refers to "the data in the Preliminary Studies and Materials and Methods portions of this [grant] application", CP, at 254, yet no such section appears in the 23-page sealed proposal before us. Indeed, a comparison of the table of contents of the grant with the sealed proposal reveals that only section 1 was submitted. See CP, at 482. The whole of section 2, titled "Research Plan", is missing from the record. Finally, though only 23 pages of the grant proposal are in the record, the grant proposal had at least 55 pages.[16] See CP, at 529.

---

[14]As indicated above, the anti-harassment statute qualifies as an "other statute" for purposes of the Public Records Act. Under it, the names of researchers may be withheld in appropriate circumstances. Here, the University has already disclosed the identity of the letter's author. However, the nature of the letter is such that its nondisclosure may be warranted under the anti-harassment statute. As this involves a factual inquiry, it is best reserved for the trial court on remand. The two other sealed documents (CP, at 628-30) are not covered by any exemption, and should be disclosed on remand.

[15]The Legislature recently enacted a comprehensive act relating to ethics in public service which implicitly recognizes this very fact by making silent withholding an ethical violation.

(4) No state officer or state employee may intentionally conceal a record if the officer or employee knew the record was required to be released under chapter 42.17 RCW, was under a personal obligation to release the record, and failed to do so. This subsection does not apply where the decision to withhold the record was made in good faith.

Laws of 1994, ch. 154, § 105, p. 742. The provision takes effect January 1, 1995. Laws of 1994, ch. 154, § 319, p. 769.

[16]The missing material may be the result of some agreement between the University and PAWS that has not been made part of the record. This would

■ The Public Records Act clearly and emphatically prohibits silent withholding by agencies of records relevant to a public records request.[17] The statute explicitly mandates that:

> Agency responses refusing, *in whole or in part*, inspection of *any* public record shall include a statement of the specific exemption authorizing the withholding of the record (or part) and a brief explanation of how the exemption applies to *the record withheld.*

(Italics ours.) RCW 42.17.310(4). Silent withholding would allow an agency to retain a record or portion without providing the required link to a specific exemption, and without providing the required explanation of how the exemption applies to the specific record withheld. The Public Records Act does not allow silent withholding of entire documents or records, any more than it allows silent editing of documents or records. Failure to reveal that some records have been withheld in their entirety gives requesters the misleading impression that all documents relevant to the request have been disclosed. *See Fisons*, 122 Wn.2d at 350-55. Moreover, without a specific identification of each individual record withheld in its entirety, the reviewing court's ability to conduct the statutorily required de novo review is vitiated.

---

appear to be unlikely, however. See CP, at 336. In any event, this presents an issue of fact to be resolved by the trial court on remand.

[17] The University suggests that an agency's decision-making process concerning whether to release a public record is generically insulated from pretrial discovery. We need not address this in depth. As we have previously noted, "leaving interpretation of the act to those at whom it was aimed would be the most direct course to its devitalization." *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 131, 580 P.2d 246 (1978). The agency's decision not to disclose records, and the grounds for that decision, are precisely the subject matter of a suit brought under the Public Records Act. *See* RCW 42.17.340(1). Absent a showing that a given record is covered by a specific exemption or other statute, the record is disclosable. Specific limitations on pretrial discovery, such as the attorney work product privilege, are covered by RCW 42.17.310(1)(j). Of course, the court may decide to conduct a hearing on disputed public records based solely on affidavits. RCW 42.17.340(3). This may include affidavits of decisionmakers that they have not silently withheld relevant records. *See Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971) (court may require administrative officials to give testimony where there are no formal findings and examining decisionmakers may be only way to ensure effective judicial review).

The plain terms of the Public Records Act, as well as proper review and enforcement of the statute, make it imperative that all relevant records or portions be identified with particularity. Therefore, in order to ensure compliance with the statute and to create an adequate record for a reviewing court, an agency's response to a requester must include specific means of identifying any individual records which are being withheld in their entirety.[18] Not only does this requirement ensure compliance with the statute and provide an adequate record on review, it also dovetails with the recently enacted ethics act.

### ATTORNEY FEES AND PENALTIES

The Public Records Act provides, in part:

> Any person who prevails against an agency in any action in the courts seeking the right to inspect or copy any public record . . . shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action.

RCW 42.17.340(4). Attorney fees incurred on appeal are included. *Progressive Animal Welfare Soc'y v. UW*, 114 Wn.2d 677, 690, 790 P.2d 604 (1990). Because we affirm the excisions made by the trial court, we remand to the trial court for a determination of the attorney fees due PAWS. The trial court may determine PAWS' attorney fees and allowable costs both at the trial court and on appeal. *See* 114 Wn.2d at 690-91; RAP 18.1(i).

As to penalties, the statute specifies that "it shall be within the discretion of the court" to award to a requester who prevails against an agency not less than $5 and not more than $100 for each day the requester was denied the right to inspect or copy the public record. RCW 42.17.340(4). Both parties invite this court to create a standard governing imposition of penalties in public records cases. Because this case is before us on summary judgment, and because we

---

[18]The identifying information need not be elaborate, but should include the type of record, its date and number of pages, and, unless otherwise protected, the author and recipient, or if protected, other means of sufficiently identifying particular records without disclosing protected content. Where use of any identifying features whatever would reveal protected content, the agency may designate the records by a numbered sequence.

remand, we decline to create a standard at this time. We note only that, as we have previously observed, " 'strict enforcement' of fees and fines will discourage improper denial of access to public records." 114 Wn.2d at 686 (quoting *Hearst*, 90 Wn.2d at 140).

## CONCLUSION

While the records requested by PAWS are in large part protected from disclosure, the grant proposal at issue here does not come within an exemption that authorizes withholding it in its entirety. Therefore, we affirm the trial court's decision to disclose appropriate portions of the grant proposal. We remand to the trial court for a factual determination of whether any other relevant records were silently withheld, and for a determination of attorney fees.

GUY and MADSEN, JJ., concur.

ANDERSEN, C.J. (concurring in the majority) — No organization should be able to use the state public disclosure act[19] (Act) to interfere with legitimate, potentially lifesaving, medical research and I abhor such action. I find compelling the University's position that premature revelation of information about potential research projects could chill future research efforts.

That said, I also concede that the law as the majority declares it is correct. It is the duty of this court to uphold the law as enacted by the people of this state unless it is unconstitutional. We have no right to substitute our judgment for the judgment of either the duly elected legislators of this state or that of the people when exercised through the initiative process.[20] As much as I would like to agree with the result reached in Justice Brachtenbach's dissent, I find no principled way to do so. I fear that the creation of a broad and general exception to the Act, as envisioned by the dis-

[19]RCW 42.17.250-.348.

[20]*In re Rosier*, 105 Wn.2d 606, 619, 717 P.2d 1353 (1986) (Andersen, J., dissenting in part, concurring in part).

sent, would eviscerate the Act. Although the dissent's construction of the Act might result in a wise outcome in this present case, it is too broad and I believe it would go far toward destroying the very heart of the public records portion of the public disclosure act. Any response to the problem presented by this case must come from the Legislature. The proper solution lies not in a strained construction of the statute by this court, but in narrow exceptions to disclosure carefully crafted by the Legislature to curb the misuse of the Act. As I explained some years ago in my dissenting decision in *In re Rosier*, 105 Wn.2d 606, 717 P.2d 1353 (1986) (Andersen, J., dissenting in part, concurring in part):

> The state freedom of information act provides specific *statutory exemptions* from disclosure for those particular categories of public records most capable of causing substantial damage to the privacy rights of citizens or damage to vital functions of government if they are disclosed. These statutory exemptions were carefully drawn and have subsequently been changed and added to by the Legislature as it deemed necessary.

*Rosier*, 105 Wn.2d at 621.

If the Legislature finds that the disclosure of parts of unfunded grant proposals will seriously hamper legitimate medical research, then the Legislature has every right to enact protective exemptions from disclosure. As I also noted some years ago in another setting, suffice it to say the Legislature is the appropriate forum in which to do battle on this issue. *See Caminiti v. Boyle*, 107 Wn.2d 662, 675, 732 P.2d 989 (1987), *cert. denied*, 484 U.S. 1008 (1988).

I therefore concur with the law as explained by the majority.

JOHNSON, J., concurs with ANDERSEN, C.J.

BRACHTENBACH, J. (dissenting) — The majority overrules our 1993 unanimous holding in *Dawson v. Daly*, 120 Wn.2d 782, 845 P.2d 995 (1993). To avoid a direct clash and inconsistency with the holding of *Dawson*, the majority simply characterizes the *Dawson* holding as dicta. Majority, at 261 n.7.

The majority makes no analysis of what *Dawson* actually said and held. It asserts that the *Dawson* "dicta" found an independent source of an *exemption* in RCW 42.17.330. *Dawson* made no such holding.

The majority's cavalier dismissal of *Dawson* reveals the fundamental confusion and error in the majority's analysis. RCW 42.17.330 does not create an *exemption* in addition to those set forth in other sections of the statute.

First, looking at the majority's characterization of the *Dawson* holding as "dicta", the language of the *Dawson* opinion disproves the majority's conclusion which is made without any pretense at analysis of the issues and holding in *Dawson*. That opinion states: "We *hold* that RCW 42.17.330 *does create* an independent *basis* upon which a *court may* find that disclosure is not required". (Some italics mine.) *Dawson*, at 794. In fact, *Dawson* went on to provide that if the trial court on remand found the requirements of RCW 42.17.330 to be met, it should enter an appropriate injunction. That hardly smacks of dicta.

Second, the majority's analysis collapses when RCW 42.17.330 is viewed, as it must be, not as an *exemption*, but as an independent basis for a court to enjoin the disclosure of *specific* documents or parts thereof. That is precisely what *Dawson* held and what the statute itself provides.

By searching RCW 42.17.330 for a separate *exemption* the majority misses the point entirely. Looking at the various statutory exemptions, one finds they relate to categories, *e.g.*, RCW 42.17.315-.31902. On the other hand, by its language, section .330 relates only to "any specific public record". We unanimously recognized this difference which the majority now ignores. We said: "However, the protection provided by RCW 42.17.330 differs from that provided by the exemptions in RCW 42.17.310(1) [the exemption there urged]." *Dawson*, at 794.

When the distinction is drawn, as the statute mandates, between statutory exemptions and the court's authority under section .330, the majority's citation of legislative amendments of *exemptions* becomes irrelevant.

If section .330 means only what the majority concludes, the statute would be unnecessary because exemptions would exist in other sections of the statute. If section .330 is to have any meaning, it must grant, not an exemption, but an independent *basis,* as clearly held in *Dawson,* to enjoin disclosure as to specific records when its demanding conditions are met. An exemption is absolute; section .330 is a grant of individualized discretionary authority.

This critical distinction can be easily shown. RCW 42.17.310(1)(s) *exempts* from disclosure membership lists of camping resorts, condominiums, etc., when in the possession of the Department of Licensing. That is a true exemption which can be asserted by the agency. There is no balancing of interests and no requirement for nondisclosure except that the document be that described in the exemption.

In stark contrast, section .330 relates not to a category of documents, but to a *specific* document. The court cannot withhold disclosure unless it finds "such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions". RCW 42.17.330.

It makes no sense at all to give the court the authority provided in section .330 if a document is provided an *exemption* by another section of the statute.

There are no disputed facts and our review is de novo. I would hold the obvious: biomedical research, including the use of animals under the rigid conditions present, is a vital governmental research function of the University. The Legislature has recognized that fact. RCW 9.08.080. The record shows that animal research is heavily regulated at the federal level to ensure humane treatment of animals and their use only in limited circumstances.

The record also satisfies the requirement that this vital governmental function would be substantially and irreparably damaged through disclosure of unfunded grant proposals. The record is replete with uncontradicted proof that disclosure will have a profound chilling effect on bio-

medical research at the University. Particularly damaging is the effect of disclosure upon collaborative efforts with researchers outside the University. The record is uncontradicted that there will be a similar loss of collaboration with industry.

Finally, disclosure is not in the public interest. The disclosure mandated by the majority will severely disadvantage the University in its funding efforts, and therefore its research efforts — a result clearly contrary to the public interest and human beings who have benefited greatly from such research.

The propriety of use of animals in research is not before the court. I recognize the deeply felt opposition of some persons to such research, but the Legislature and Congress have recognized that animal research is of great value to the people and must be protected. Plaintiff seeks information not for the sake of knowledge, but to impede and if possible destroy a method of vital research. I do not quarrel with the right of Plaintiff to use every resource to accomplish its purpose, but this court need not blindly assist by misreading the statute and overruling *Dawson*. If *Dawson* does not represent a proper interpretation of RCW 42.17.330, why did the Legislature not amend section .330 in its 1993 or 1994 sessions? *Dawson* clearly held contrary to what the majority now holds, but for two sessions the Legislature acquiesced. The lack of legislative repudiation is highly significant.

I would apply RCW 42.17.330, as unanimously interpreted in *Dawson* in February 1993, and reverse.

UTTER and DOLLIVER, JJ., concur with BRACHTENBACH, J.

Reconsideration denied February 1, 1995.